Bickley *v.* Morgan Utilities Company, Incorporated.

Opinion delivered May 9, 1927.

1. Nuisance—ice plant in residential district.—In determining whether the operation of an ice plant should be restrained in the residential district of a city, the test whether, under the circumstances, its operation would constitute a nuisance is the reasonableness of operating the plant in such a locality, and under the attending circumstances.

2. Nuisance—operation of ice plant enjoined.—The operation of an ice plant in a residential district *held* a nuisance and should be restrained, where it materially injured property and annoyed the residents, regardless of how well it was constructed or conducted.

Appeal from Miller Chancery Court; *C. E. Johnson,* Chancellor; reversed.

*James D. Head,* for appellant.

*Rose, Hemingway, Cantrell & Loughborough,* for appellee.

Mehaffy, J. This is a suit by appellants for an injunction to prevent the erection and maintenance of an ice plant on lots 5 and 6, in block 58, in the city of Texarkana. The following is in substance the complaint filed in the chancery court:

"The complaint alleged that the appellants were respectively the owners of lots set out therein; that the Morgan Company had purchased lots 5 and 6, in block 58, with the avowed intention and purpose of erecting thereon a plant for the manufacture and sale of ice; that appellant's lots were adjacent to the location selected for said plant; that appellants and their predecessors had continuously owned lots referred to for twenty years or

more, and during all of which time the same had been devoted exclusively to residential purposes; that the homes of each of the appellants were located on the various lots described in the complaint. It was also alleged that the defendant had begun excavation for an ice plant, and would continue the construction and erection thereof, unless restrained; that the maintenance and operation of an ice plant would materially interfere with the enjoyment by plaintiffs of their homes; that they would be greatly annoyed and harassed by continuous and successive noises throughout the day and night, which noises were necessarily incident to the operation of such plant; that trucks and automobiles congregated at said plant would emit noises in starting and stopping and in loading and distributing the ice, and that, by reason thereof, the peace and comfort of their homes would be disturbed and rest therein would be rendered almost impossible; that ammonia fumes would escape from said plant, to the great annoyance and detriment of appellants, and that the value of their property would be greatly depreciated and the occupancy thereof for dwelling rendered uncomfortable and practically impossible by the noises incident to the operation of said plant. That lots 5 and 6 had never theretofore been used for manufacturing purposes, but had been used almost exclusively for residential purposes. That the operation of said plant would necessarily result in a nuisance, to the irreparable damage of plaintiffs in the enjoyment of their homes, and in reduction of the market value of their property.

The prayer was for an injunction restraining the erection and maintenance of said ice plant.

The appellee filed answer, in substance as follows:

The answer denied the material allegations of the complaint, except the ownership by appellants of the various properties therein set out, and especially denied that the said plant would result in annoyance or disturb the rest of or the enjoyment of the comfort of the homes of the appellants. It alleged the purchase by Morgan Company of the property, at which time there was a

small frame cottage and filling station and an automobile paint shop thereon, and admitted that it was engaged in the construction of an ice plant thereon. It alleged that Broad Street is the main business street of the city, and is just south of Third Street, and that Broad Street is built up almost entirely of business concerns, including manufacturing concerns, and had been in such condition for years; that, in the past few years, Third Street has been taken for business purposes and practically all the residences removed therefrom, and that recently the fire limit had been extended by the city council, so as to include both blocks 58 and 59 of the city, of Texarkana; that a permit for the erection of the building had been issued by the city authorities; that the business section was fast encroaching upon Third Street; that no new residences had been erected on Third Street for many years, and the old residences were being removed therefrom. The answer further alleged that the ice plant being erected would be modern, operated by electric motors, and practically noiseless; that it would be kept sanitary, and would be so erected and constructed as to be beautiful; that the deliveries of ice and ingress and egress to the plant therefor would be made from the Third Street side of the property, and that the erection and operation of said plant would not be a nuisance.

J. G. Bickley testified, in substance, that he had lived in the city for thirty years, and lived on lot 4 in block 58, and had lived there for seven years; that all of the lots in block 58, except 5 and 6, were occupied solely by residences, and there was only one rent house in the block, a residence owned by Olivette. Howard owns lot 8, in block 59, and in addition thereto has a little confectionery store in front of the house, while the east half of block 59 is owned and used by the Catholics for school and church purposes. Block 58 is used solely for residences, except a little plumbing shop and filling station on lot 6, and a little paint shop. There are no business houses in block 56. On block 55 there is an office building of the Security Mortgage Company, and from there on to

Hazel Street it is all residences. South of Third, in block 69, there is a garage, while Buhrman-Pharr Hardware Company is in block 68. The north half of block 67 is residences, while the south half of 67 is a little brick store. North half of block 66 is wholly residences. On the south half of 66 there is a streetcar barn; on the south half of 65 there is Tennison's tin shop; on the north half of that block are residences. Across Hickory Street, in block 64, the property is occupied by stores, residences and a garage; all of the property east of Hickory and north of Third to County Avenue streetcar line is occupied by residences, and the whole district of Fourth Street back to Hazel Street is devoted exclusively to residences, except a tire shop on Fourth Street. The Bottoms house, the second finest in the city, is on Fifth and Hickory, while W. H. Arnold lives directly across. in front.

The brick wall of the ice plant is within six feet of witness' bedroom window. They left a big window on the side next to witness' property. The first witness knew of the erection of the plant was when the work was begun, and he served notice on them that he was going to enjoin them. This was a week or ten days before suit was begun. No material had been put on the ground when notice was served.

Witness stated that he had observed the operation of the electrically driven ice plant of Mr. Powers, on Broad Street. At the time he took notice particularly of it it was only running a part of the machinery, but could easily be heard two blocks away at night. Witness is located two and a half blocks from the Powers plant. It would be necessary, in the operation of the plant of appellee, to use trucks or teams to distribute the ice, and that in the summer time plants are operated day and night. They begin their deliveries at four or five o'clock, and witness stated he could not live in his house at all because of the noise and fumes from the ammonia. He could smell ammonia from the Powers plant when out in the street, and could hear the running of the engine of the

Powers plant two and a half blocks from it. The ice is manufactured in sheet-iron buckets, and, when frozen, the buckets are dumped in hot water, and, when they pull more than one can at a time, you can hear them half a mile on a still night.

If they began operation at four o'clock in the morning there would be no sleep, and witness' property would be ruined for residential purposes, and he knows of nothing else that could run on his property, unless it was a tin shop or something of that character. Nearly all of the property in blocks 56, 57, 58 and 59 are owned by people who live in them; there are just a few rent houses. Mr. Booker, one of the plaintiffs, has lived there twenty years; the Brannons fifteen or twenty years; Mr. Casey has owned his property for twenty years.

On one of the lots, owned by Olivette, there is a small storehouse; the tire shop referred to is a little retail shop where they sell tires. The Iron Mountain Railroad has its main line and switch tracks beyond Broad Street, and Standard Lumber Company faces them. There is a coal-chute on Broad Street, and the Standard Lumber Company is two or three blocks from that. The coal-chute and the lumber plant run only in the daytime. The operators of streetcars live on the north part of block 66. Streetcars begin running at six o'clock in the morning. They are a block from witness' property, but he can hear them. In the daytime they can hear the tin plant, and there is nothing in the vicinity operating at night, except the streetcars, which run rather late. Witness knows nothing of the operation of ice plants. The only opening is on Pecan Street, and witness supposes they are going to unload ice there.

There have not been many buildings erected on Third Street in the past year. Several have been erected from the streetcar line facing toward State Line, but that is several blocks away. Bradfield built a small business building in the district, and this is the only one built in five years; this was a little plumbing shop on Third Street. The Powers ice plant is on Broad Street. Busi-

ness buildings on Third Street are now being erected near State Line. The place where this ice plant is being located is the only vacant lot that has been there for ten years; the other is all built up in residences, and has been for ten years or more.

Plat was introduced as part of the record.

T. A. Clark testified, in substance, that he was a nephew of Mrs. Ida J. Bottoms, and had lived there since 1899; she lives on the corner of Fifth and Hickory Streets, about two and a-half blocks from Powers' ice plant. Mrs. Bottoms was continuously annoyed by the noises from the Powers plant, and the noises disturb people in Mrs. Bottoms' home very much. The home is a comfortable, modern home, above the average.

Witness said that he had been around ice plants a good deal, and cannot see how they could be operated without noise. He does not see how the ice could possibly be loaded or unloaded, especially at night, without making disturbing noises. These plants in the summer operate both day and night. He knows nothing about the Morgan plant proposed to be put in. The Powers plant can be operated either by a gas engine or by dynamos. It is equipped for both. There is less noise with the electric equipment than with the gas or oil engine.

Mrs. Bottoms' home is near the lumber company, but the lumber company does not operate at night. It is the night noise, when one wants to rest, that worries you. Mrs. Bottoms has continuously complained of the Powers plant, and we finally got that plant to put on mufflers and other things to quiet down the noise.

He said he had seen no residences going up on Third Street lately, and thinks the only buildings are business houses. Mrs. Bottoms would be a little closer to the Morgan plant than the Powers plant, which is on Broad Street. His opinion is based on observation of ice plants, and it would be impossible to operate without such annoyance to any one living close. The business houses being built on Third Street are all close to State Line

Avenue and west of the streetcar line on Hazel. West of the car line there has been one plumbing shop built in the past year or so.

C. K. Faison testified, in substance, that he lives on the corner of Fourth and Beech, in a two-story building with a basement and fourteen rooms, used exclusively for his residence, and the home could not be replaced for $20,000. The persons he bought the house from lived there 26 years. He thinks the erection of an ice plant would reduce the value of his property 25 per cent. at least. That he has been around ice plants some and knows something of the operation of machinery. There is much noise of dumping ice into the vault and from the vault to the wagon. The noise from the plant running at night is bound to disturb those in residences, and, if loading began at four or five o'clock in the morning, you would have the same situation. ''I cannot see how Texarkana could have business houses out as far as where I live for twenty years yet. There are no business buildings now within a block of it, and I reside within half a block of it. There are beautiful residences and churches all around. With the exception of one little store building, it has not been used, since I have been in Texarkana, for anything other than residences. I have lived in this dwelling for seven years, and the city has grown a good deal since I came here, both in business and residential sections. Business has not encroached on the north side of Third Street. On the south side of Third, the only business house amounting to anything is Buhrman-Pharr Hardware Company. No business houses have been built there east of the streetcar line on Hazel since I have lived there, with the exception of Bradfield's plumbing shop on Beech. I am three blocks from the railroad and more than that from the chute. I have rent-houses on Beech and Fourth Streets, and behind the rent-houses is a little store. There is no manufacturing plant north of Third Street, and has not been for 16 years. The only business house on Fourth Street is a small tire shop. Practically all the people own their

own homes. You can hear the Powers plant two blocks and a half when the wind is against you. You can smell the ammonia before you get to the ice plant. No new homes have been built in the vicinity lately, because there are no vacant lots. There are some vacant lots adjacent to the Catholic school, but they are not on the market. Powers plant is three and a half or four blocks from where I live. We sometimes hear the noise of ice plant and the trucks from Powers plant.''

E. V. Olivette testified, in substance, that he had experienced disturbances from the Powers plant, had heard them load the trucks and men swearing, and, when the windows are open in summer, they heard the noise very plainly, and it disturbed them very much.

J. B. Booker testified that he lived in block 58 and had lived there for 33 years, and owned his home all that time. He is well acquainted in that community, and, with few exceptions, they all own their homes. Outside of the plumbing shop and little store on Pecan and Third and the barn or storage house built by Beasley on the north side of Third, there is nothing except this automobile shop referred to on Fourth Street, except residences. The only store in the vicinity now is a small one in front of the Bickley residence, and that is not large enough for a garage, and the man who owns it has a residence on the same lot. You can hear the noise from the Powers plant two or two and a half blocks away, and probably more than that. The operation of an ice plant, in my judgment, as proposed by Morgan, would materially annoy me and my family in our home, and I think we could not live there in any comfort, as we are only 150 feet from the plant. In summer it is necessary that we have our windows up, and from my house I can hear the noises of loading and unloading ice at the Powers plant. At night those noises are more perceptible than in the daytime. I know nothing of the Powers plant. I have brought no suit against the Powers ice plant. It is two blocks further off than the Morgan plant. I know it will be impossible for them to run it without noise.

It is impossible for any machinery that I have ever heard to run without noise. I own two houses there, and it is all the property I have in the world. I could not get a fair price for it. The property could not be devoted to any other purpose.

Chattie Casey lives across the street from Mr. Booker, and has lived there all her life. Her father is now ill. That in summer time they can hear the Powers plant from her house, and it was almost impossible to live there until last summer, when they muffled the noise some. They don't think they can live there with the Morgan ice plant running. In summer it disturbs them, because these noises begin about four or five o'clock, and there is no means of shutting them off from their house. The ice-wagons come around their place about five o'clock in the morning, and get started about four. They could hear the trucks loading every morning. It would be bad to live right close to an ice plant on account of the noises, not only from the machinery but also from the trucks and the men operating them.

Mrs. Katherine Gray testified, in substance, she was the daughter of Mr. Faison (Booker), who is an engineer on the railroad, and sleeps in the daytime. When the wind is in the right direction they can hear, in the day-time, the Powers ice plant, and hear the trucks and the noise of the people down there. From her experience with the other plant she doesn't see how they could live there at all with the Morgan plant running.

Mrs. J. S. Kirby testified, in substance, that she lived in the home of J. G. Bickley, and in the early morning the noise from the Powers plant from their trucks and wagons disturbs them. She said, from her experience and observation, she thinks it would be impossible for them to stand the noise and racket in the early morning hours incident to the operation of the Morgan plant.

Basil Phillips testified, in substance, of living in Dallas, Texas, and said that his experience had been confined to Dallas and adjoining cities. That his experience is that the effect of manufacturing establishments being

constructed in residential districts materially detracts from the property's desirability in that particular section for residential purposes and materially damages the value of the property therefor. Has noted that the construction of ice plants in residential districts materially affected the value of the property for residential purposes. It reduced the place to a very undesirable section, and the houses were all turned into tenements and apartment sites, which did not bring the best of rent. He buys and sells property as a broker. If property is growing into a business section, then in the course of time it would be valuable. In modern city building ice plants are called industries, and their location near residence districts, or retail business sections, is always avoided, and if this ice plant were erected in the vicinity of the business houses, in retail districts of the city, the business property adjoining would be depreciated by its erection. He knows nothing of local conditions in the city of Texarkana.

W. W. Rogers testified, in substance, that he had been in the ice business as a manufacturer, and had kept up with the improvements in ice machinery. There is no such thing as an absolutely noiseless ice plant. There is always some noise attendant upon moving machinery, and, with the very latest machinery, you would have some noise. You have the clicking of the valves of the ice machines and hum of motors and noise of that character. It would be annoying to a person living within six feet of the plant. Ice plants are ordinarily located in industrial centers and not in residential districts. However, in recent years, quite a number of ice plants have been built in residential districts of the city.

M. B. Morgan, for the defendant, testified as follows: That he was president of Morgan Utilities Company, and has been in the ice business for twenty years, having experience both practical and technical. The company owns 16 ice plants. Two in Little Rock, one at El Dorado, one at Conway, one at Jonesboro, and plants at other points in Texas. Two plants of the character of

the one proposed here were constructed by them in Little Rock last year, but different building construction, one being at Sixth and Main, North Little Rock, and the other on the Nineteenth Street Pike, or Asher Avenue. The North Little Rock plant is completely surrounded by residences on the north, east and south sides, and the plant on the Nineteenth Street Pike is strictly in a residential district, with the exception of one store adjoining the plant. Have had no trouble in these communities. They consider the plant an asset. That they are erecting in Texarkana a raw water synchronous motor-driven ice plant, the latest thing in a motor-driven job. The ice crane as well as the hoist is motor driven. The loading of the ice will be done in a vault inside of the building, so as to avoid undue noise from that part of the job. Loading of the trucks will be done on the company's property. The loading dock for retail trade will be in a 30-foot space at the back, housed and inclosed at both ends. The opening on the east side is principally left for putting in the machinery. The storage vault is on Third Street, without opening, the machinery being directly behind the vault. No window openings at the rear. The 32-foot space at the rear will be housed in with brick, and there will be 8-foot rolling doors through which the trucks will come in from the alley up to the dock, loading under cover approximately 150 feet from any house. The retail dock is seldom used after 8 o'clock at night. The plans call for a flower garden in front of the building and flowers on the side. On the top of the building are the cooling spray pumps, instead of a cooling tower. The sprays will not be within 30 feet from the edge of the building on either side, and will be hid from the street; there will be no noise, grease, dirt or anything objectionable on the outside of the building, and the only thing one could hear ten feet away from the plant is the blower. There will be a scoring machine, which will be the next noisiest machine, located in a vault, and you cannot hear the noise from that. Wholesale deliveries are begun ordinarily in the morning at 5 o'clock. The

drivers will be at the plant in time to serve the residents from 6:30 until noon. The wagons for the residential sections load about 6:30 in the morning, and the ones loading at five o'clock serve the wholesale trade, such as restaurants, hotels, etc. The noise of trucks and drivers depends on the kind of employees, whether noisy men or good men. There is no reason why there should be unnecessary noise or confusion in loading the ice. It only takes about ten minutes to load an ordinary ice-truck at this particular plant. By the modern method there is little noise from the ice-can, and they are raised by an electrical device and that is practically noiseless in operation. The only noise you can hear from the dumping of the ice is about equal to that of a man stepping on a hardwood floor. The ice falls from the can to the floor.

Witness here introduced a picture of the ice plant at Little Rock, and also a picture of the plant at Breckenridge, Texas.

The Powers plant was a scrap or junk plant, which had been built for a gasoline engine and later changed to a motor plant. It is a belt-driven plant, which in itself is noisy. Little Rock, in the State Hospital for the Insane, has an ice plant, one in the insane asylum, the Confederate Home, the Runyan Hospital. In the insane asylum the plant is in the basement, in the others the plants are located in the building adjoining the patients' rooms. Expect to operate the plant full 24 hours.

The blower is the noisiest thing in this plant. You can, of course, hear the compressor and the clicking of the valves as they seat themselves. The number of trucks used in the business will depend on the amount of the business. The retail trucks will come into the building probably fifteen minutes of six and the wholesale trucks will be there before five o'clock in the morning. If you were to drive by the plant at Sixth and Main in North Little Rock you couldn't hear it running from the sidewalk. The same is true of the other two plants which we have recently put in. Near the plant at Sixth and

Main there is an elevator, and half a block from the plant a lumber yard. There is nothing on the other side of the building. On the south side there is a block of residences; west, a lumber yard and elevator. The plant on Nineteenth Street Pike is about three miles from the main part of town. There is an ice plant of the Southern Ice & Utilities Company and a store within 100 feet of us on the pike. We are 6 or 8 blocks outside of the city limits. We sell the ice to retail trade, and do not deliver any at all. Ammonia fumes depend on the operators. The stuff being put in this plant will last a lifetime. If you have the inclosed type of compressors, you won't have the fumes. The scoring machine makes the noise of an ordinary buzz saw, but is inclosed in the ice vaults, and the noise from that would not penetrate outside. Got a permit for the plant from the city of Texarkana.

L. C. Lewis, a mechanical engineer, testified, in substance, he is familiar with the machinery proposed to be put in and has driven up in front of a similar plant in Little Rock and had to look inside to see if the plant was being operated. Eight feet from the door you can't hear the plant being operated from the sidewalk. You can hear the hum of the motor and the machine turning over, which is not objectionable when you get 8 feet away. The pump makes no noise, but you might hear the swishing of the water four or five feet from it, but not outside the building. The plant is so constructed as that ammonia may be transferred from one part of the system to another so the fumes cannot escape to any great degree, even if a break occurs. All hotels have ammonia plants such as this. In the General Hospital at Little Rock they have an ice plant making a ton and a half a day, and the machinery is in the main building, the cooling system being on top of the one-story part, with the water running over breakers day and night, and patients' rooms are above that. At the Hospital for Nervous Diseases the plant is installed thirty feet from the wall; and in St. Vincent's Infirmary the machinery is in the same

building, and they have no objectionable escape of ammonia. Powers' plant is no plant at all, though he is now operating it with electricity. Southern Ice & Utilities Company is a steam plant, not modern. Everybody knows how much noise a truck makes. It depends on how they are equipped. At filling stations the cars drive in just about the same as in a place like this one.

Dan Dewberry testified, in substance, he has been in the real estate business in Texarkana for ten years. The buildings erected on Third Street the last ten years have been business buildings, and no residences within that time, and considers Third Street the next business street. Third Street is rapidly growing into a business street. As to whether he would consider a filling station or garage an asset to a residence district, he said it would depend altogether upon the type of the filling station, and said that he would consider a high class one an asset.

This action was begun in the chancery court to restrain the operation of an ice plant in the residential district in the city of Texarkana. The undisputed proof shows that the ice plant is located in a thickly populated section of the city; a section devoted to residences almost exclusively, and within six feet of the bedroom window of one of the plaintiffs. There is some conflict in the testimony as to the noise and fumes caused by the operation of a modern ice plant, but there is no dispute about the place being a residential district, and there is no dispute about its close proximity to some of the residences. It is also undisputed that there will necessarily be some noise; that the loading and unloading and operation of the plant will create some noise, and many of the witnesses testify that it would greatly reduce the value of property, and some of them testify that it would be impossible to live in the homes they have occupied for many years if the ice plant is operated there.

The operation of an ice plant is a lawful business, and the only question here is whether, from the evidence in this particular case, the operation of said ice plant should be restrained, and a fair test, under the circum-

stances, as to whether its operation would constitute a
nuisance is the reasonableness or unreasonableness of
operating the ice plant in the particular locality and
under the circumstances of this case. The locality is to
be considered in determining whether it is a nuisance,
for what might be a nuisance in one locality might not be
in another. Operating an ice plant might be perfectly
proper in a business or manufacturing neighborhood, and
a nuisance when carried on in a residential district. And
it makes no difference how lawful a business may be in
itself, or how suitable the location may be, these things
cannot authorize the carrying on of a business that
directly, palpably and substantially injures another's
property or causes unnecessary annoyances to persons
in the vicinity, especially when there is no showing that
a suitable and convenient location might not be had in the
city of Texarkana where there would be no injury done
to residential property or to the residents. No definite
rule can be given to govern all cases, but each case must
depend on the particular circumstances which character-
ize it, and it is proper to consider the nature of the
business, the kind of annoyance, the location, the sur-
roundings, and all the attending circumstances.

In this case the proof shows not only that the opera-
tion of the ice plant would materially injure the prop-
erty, but it also shows that the residents would be
annoyed and suffer very great discomfort if the ice plant
was permitted to operate at this place.

This court, in the case of *Durfey* v. *Thalheimer*, 85
Ark. 584, 109 S. W. 519, said:

"It is the duty of everyone to so use his property
as not to injure that of another, and it matters not how
well constructed or conducted a livery stable may be, it
is nevertheless a nuisance if it is so built as to destroy the
comfort of persons owning and occupying adjoining
premises, creating annoyances which render life uncom-
fortable, and it may be abated as a nuisance."

And it may be said here that it matters not how
well constructed or conducted an ice plant may be, it is

nevertheless a nuisance if built and operated in a residential district so that it destroys the comfort of persons owning and occupying adjoining premises, creating annoyances which render life uncomfortable. Certainly it cannot be said that the erection and operation of an ice plant within six feet of a bedroom window would not very greatly annoy the persons occupying the room, in addition to the fact, as shown by the proof in this case, that the property itself would be greatly damaged, worth much less than if the ice plant was not operated there.

Consideration of the testimony in this case leaves no escape from the conclusion that the operation of the ice plant in the residential district where located would not only injure the property but would be a serious annoyance to the residents in the locality.

This court, in deciding a case where the industry was established before the residences were built, said:

"The case affords, perhaps, an example where a business established at a place remote from population is gradually surrounded and becomes part of a populous center, so that a business which formerly was not an interference with the rights of others has become so by the encroachment of the population. Under these circumstances private rights must yield to the public good, and a court of equity will afford relief, even where a thing, originally harmless under certain circumstances, has become a nuisance under changed conditions." *Ft. Smith* v. *Western Hide & Fur Co.,* 153 Ark. 99, 239 S. W. 724.

If it is true that, where an industry is established at a place remote from population and is afterwards surrounded and becomes part of a populous center, the industry becomes a nuisance so that it will be restrained by the court, certainly, when the place selected is in a residential district, and the persons proposing to establish the ice plant are notified before any material is placed on the ground, it is the duty of the court to prevent the nuisance, if the proof shows it to be such.

This court has also said:

"The maxim, 'use your own property so as not to injure another,' is peculiarly applicable in nuisance cases. If one does an act, in itself lawful, which yet, being done in that place, necessarily tends to the damage of another's property, it is a nuisance; for it is incumbent on him to find some other place to do that act, where it will be less offensive. * * * That is a nuisance which annoys and disturbs one in possession of his property, rendering its ordinary use or occupation physically uncomfortable to him. For such annoyance and discomfort the courts of law will afford redress by giving damages against the wrongdoer, and, when the causes of annoyance and discomfort are continuous, courts of equity will interfere and restrain the nuisance." *Yates* v. *Mo. Pac. Rd. Co.,* 168 Ark. 170, 269 S. W. 353, 38 A. L. R. 1434.

The operation of this ice plant in a residential district, under the proof in this case, would be a nuisance. The decree is therefore reversed, and the cause remanded with directions to enter a decree in favor of the appellants according to the prayer of the complaint, restraining the appellee from maintaining a nuisance.

Justices KIRBY and McHANEY not participating.

Mr. Justice SMITH dissenting.