YAFFE v. FORT SMITH.

Opinion delivered November 19, 1928.

*Hill, Fitzhugh & Brizzolara,* for appellant.

*Roy Gean,* for appellee.

MEHAFFY, J.   The appellant, who was defendant below, had been operating a junk yard on the south side of the city of Fort Smith, near the yards of the Fort Smith & Western Railway Company, for a number of years.   The scrap iron in which the defendant dealt was stored in three places; that is, three different piles. Appellant says that one pile is ordinary junk, another made up largely of automobile parts, and the third consisting of I-beams and structural iron, which was retailed by him for use in buildings.   The three piles are within a block of each other.   There are no residences near the junk yard, and the business enterprises near there were put there after the defendant established his junk yard.

The plaintiffs below were the city of Fort Smith, members of the board of health, and C. N. Geren, Allen Henderson, Tom Drake, L. S. O'Neal, Leon Williams and Mechanics' Lumber Company.   All had business property in the vicinity of the junk yards.   They alleged that the junk yards were a public and private nuisance; that appellant unlawfully, knowingly and willfully kept stored on the property used as a junk yard a large pile of old automobiles and parts, irons, steel, castings, rubber, bones of animals, tin cans, buckets, containers, glass jugs and jars, rags, boilers, pipes, sheet iron, and all kinds of old junk of almost every conceivable kind, character and description, all of which is piled in and on the streets and sidewalks, and piled under sheds and on vacant property, several feet high, much of which protrudes out on the sidewalks.   That appellant burned rubber, which created offensive odors, and that there were many old containers that held water and created breeding places for mosquitoes; that it created an unhealthy, unsightly and dangerous condition, and that the plaintiffs suffered great and irreparable and continuing damage; that appellant had often been requested and demanded to abate the

nuisance, but he refused to do so. It is also alleged that the maintaining of the junk yard in the manner it was maintained impedes and prevents the development of that section of the city.

The plaintiffs below owned valuable property in the vicinity of the junk yard, and they alleged that rats accumulated and inhabitated in said junk yard, and that the accumulation of said junk at the yard constituted a serious menace to the public health, welfare and safety. They also alleged that there were offensive odors and fumes, and asked that appellant be permanently enjoined and that he be required to abate such public and private nuisance.

The defendant filed a demurrer on the ground that the plaintiff had no legal capacity to sue, and also on the ground that the complaint did not state facts sufficient to constitute a cause of action. The court overruled the demurrer.

The appellant then filed a motion to strike or dismiss as to the board of health and city of Fort Smith. Both parties agree that this motion was granted by the chancellor orally, but the record does not show this. The parties, however, would have the right to amend the record by agreement.

The answer admitted that appellant was maintaining a junk yard within two or three blocks of Garrison Avenue, but he denied all the other material allegations in plaintiff's complaint. He alleged that he was doing a lawful business, and that, under the Constitution of the State of Arkansas and of the United States of America, he is entitled to conduct said junk yard; that it was not conducted in such way as to constitute a nuisance; that he had conducted a junk yard at that place for a long period of years and prior to the time of the erection of buildings by other property owners.

The court, after hearing the testimony, appointed a special commission, with instructions to go in a body to the junk yard and determine upon the basis of a decree, and to report whether it could be abated without its bodily

removal. This commission reported, recommending a perpetual injunction. This commission was appointed by the court without the knowledge or consent of either party.

The appellant then filed a motion to strike from the files the report of the special commissioners. This motion was overruled, and appellant excepted.

The court rendered a decree against appellant, holding that the junk business was a nuisance, and enjoining appellant and his employees, as prayed for in the complaint, requiring appellant, before the first of July, 1928, to erect a substantial cover over the junk piles, preventing the rain from becoming stagnant so as to prevent the breeding of mosquitoes. The decree also prevented the appellant from placing upon the premises any material except solid iron. This appeal is prosecuted to reverse said decree.

Allen Henderson, one of the plaintiffs, testified, identifying photographs, and stating that he had been in that locality for several years, and at various times had noticed rotten bones. Had also noticed cans that contained water. This witness also said that the defendant burned stuff at his junk pile every few days; burns rubber and other things that are offensive; that he had seen rats there, but did not know where they came from. Some of the junk extended out into the street. Old cars were parked around the place, and they were broken up with sledge-hammers. There were quite a lot of old oil cans with water standing in them.

On cross-examination this witness said that one of the junk piles was back of the O'Neal and Drake property, and on this property there were kept horses and mules.

Dr. Johnson, health officer of the city, testified that he made an investigation in August, 1927; saw a number of cars being dismantled on the sidewalk, and asked appellant to correct conditions. On a second trip there some of the conditions had been corrected and some had not. Appellant had put oil around in several places. At

one place there was a half car-load of automobile tires, and some cans that contained water. Also found some tubs · containing fruit jars and fenders that contained water. Across the street he found probably half a car-load of vessels that Mr. Yaffe said he bought at Camp Pike. They were pitchers, pans and like receptacles. Some of them contained water. After witness notified appellant, he removed the bones and the vessels he had bought at Camp Pike.

This witness, on cross-examination, testified that these vessels had not been there for about five months. Witness testified that the bones were removed as soon as he notified the appellant. On his second visit there the vessels that contained water had been removed. It takes mosquitoes from 9 to 18 days to breed.

Dr. Charles S. Holt testified that he was president of the board of health. He testified about the junk that was on the yards, and in this respect his testimony was substantially the same as that of Dr. Johnson. He also testified that anything that contains water may affect the health of the people. The junk was piled 15 or 20 feet high. This witness had told appellant that he would have to put a roof over his junk yards. Any place that would catch water would breed mosquitoes.

C. N. Geren, one of the plaintiffs, testified about the junk piles being unsanitary, and the wrecking of automobiles in the street, and that the junk was 15 or 20 feet high, but that he had never made any inspection of the junk piles; simply noticed them. Appellant will buy an old car and dismantle it. That they had the stuff on the streets. This witness owned cows and stock in the barn which was near this place.

L. S. O'Neal testified that the appellant had barrels standing near the building, and that he burns rubber and stuff, and you could smell it at times. That there were a lot of barrels and parts of automobiles about the place, and that it injured his property; that is, he could not rent it successfully. The barrels he saw were upside down, and he did not see any water in them.

Leon Williams, one of the plaintiffs, testified as to the junk and places holding water. That he was in the stock business. His barns are across the street from the junk pile, and he handled horses, cows and mules; kept an average of about 25 head. Also kept goats, chickens and other animals. The junk yard was there before he put his stable there.

M. J. Miller, one of the plaintiffs, testified substantially the same as the other witnesses about the junk pile, but he did not notice any green bones, and saw water only in a few places. Found some containers with water in them.

J. S. Hill, president of the Mechanics' Lumber Company, testified about the junk pile; about there being metal, wooden barrels, fruit jars and bottles that have water in them at times, and that the mosquitoes are bad at his place at night. Saw some green bones there last summer, and they had a bad odor.

Dr. James A. Foltz, a witness for defendant, testified about examining the junk yard, and that he found nothing unsanitary about it. That it was unsightly, and there were bars or iron pipes and every sort of thing. That he was interested in the water containers open where mosquitoes could breed.

Dr. James A. Foltz, Dr. E. H. Stevenson and Dr. St. Cloud Cooper all testified, in substance, that they found nothing unsanitary about the junk yard.

C. T. O'Neill, general manager of the Fort Smith & Western Railroad Company, said, in substance, that he was familiar with the place, and had never seen any stagnant water, either upon the ground or in vessels; no disagreeable odor, only the smell of oil. Never saw or smelled any green bones. The railroad company leases this property to appellant. He also said there were no residences in the immediate vicinity.

Louis Barry, superintendent of the Fort Smith & Western Railway Company, testified that he was familiar with the junk yard; saw it frequently; had never seen any mosquitoes about there, and had never detected any

disagreeable odor. Sees a fire there frequently, but never noticed any bad odor.

D. M. Boles also testified substantially the same as other witnesses as to the condition of the junk yard.

W. E. Mueller testified that he was around the junk pile frequently, once or twice a week, and had never seen any water there. There is plenty of oil on everything. Sometimes he smells pieces of burning rubber and other articles, but there are other people in the vicinity who also burn trash and rubber—the Morris Elevator Company being one.

W. T. Oglesby, who was in the feed business, testified that he passed the junk yard frequently. Never saw any stagnant water about the place and never detected any disagreeable odors. Never smelled any bones; had seen trash burning, but had never detected any bad odors.

S. B. Bradley, the bookkeeper for the appellant, also testified as to the condition of the junk yard, and that there were no containers that hold water. That the place was saturated with oil. He also testified that automobile fenders are cut in small pieces so that no piece is more than a foot square and there is nothing about it that could hold water; that there had been no bones on the premises for some time. They were told to remove them, and they shipped them out. They sometimes burn bits of leather and rubber.

H. B. Sanderson testified substantially the same as other witnesses about seeing no water or bones there, and that he had not noticed any disagreeable odor. He also said that he had seen fruit jars in barrels, but not arranged so that they held water.

The appellant himself testified at length about the condition of his junk yard, and that there were no containers that held any water. He said it would cost him $8,000 to move this junk to another place, and if he attempted to sell it at the present low market price he would lose $15,000. He testified that the blocking of the street was caused principally by persons driving automobiles and parking them there. He dismantles auto-

mobiles that he buys, and piles up the leather and sells that, and only burns the wooden part of the car. Does not use the sidewalk for his business. His fence did lean out over the sidewalk, but he corrected that. Buys all kinds of scrap iron, and all kinds of old machinery. Cuts them into small pieces, but never leaves any of it so it will hold water. He has never seen any mosquitoes about his junk yard. There are no standing pools of water there. After a rain there may be water in places, and then the oil is put there.

It would serve no useful purpose to set out more of the testimony. We have called attention to the evidence sufficiently to show that it was conflicting, and the chancellor found on conflicting evidence that the junk yard, as maintained and operated, was a nuisance. The general rule is stated as follows:

"But the unsightly appearance of a vacant lot, caused by its being used as a dumping ground for refuse material, does not of itself constitute it a nuisance to an adjoining owner nor entitle him to damages. Inasmuch as filth, refuse and garbage may constitute a nuisance unless disposed of in a suitable manner, it is generally conceded to be within the power of municipal authorities to enact ordinances providing for the collection and disposal of such matter. Indeed, the courts seem to be agreed that, in the exercise of the police power, the authorities of a municipality may rightfully require the destruction of garbage and refuse, even when they contain some elements of value. The municipal authorities, it is held, may regulate the removal and disposition of such substances, designate the agents who may rightfully remove and dispose of the same, and prohibit all persons except the designated ones from carrying such substances through the streets of the municipality." 20 R. C. L. 424.

It has also been said: "It seems that a municipal corporation has power, without special legislative grant, to prohibit the erection of works and factories and the pursuit of industries within the corporate limits which will be injurious to the public health, and destructive of

the comfort of the inhabitants, by subjecting them to offensive odors, fumes, noises, or vibration. * * * Again, neither the Legislature, nor a municipal body to which the Legislature has delegated power to control nuisances, may authorize a business to be conducted in such a manner as to constitute a nuisance. The maintenance of a manufacturing establishment which, though skillfully operated, covers neighboring property with smoke, soot and cinders, and causes the buildings thereon to vibrate, or reduces their rental and market value, has been held actionable in a State in which the constitutional amendment against uncompensated damage has been adopted, although expressly authorized by the Legislature.'' 20 R. C. L. 442.

The evidence in this case tends to show that there were containers which hold water among the junk deposited on the lot, and that this will breed mosquitoes, which will affect the health of the persons in that vicinity. In fact, the chancellor found that these facts are established by the evidence.

This court has said: ''The maxim, 'use your own property so as not to injure another,' is peculiarly applicable in nuisance cases. If one does an act, in itself lawful, which yet, being done in that place, necessarily tends to the damage of another's property, it is a nuisance; for it is incumbent on him to find some other place to do that act, where it will be less offensive. * * * That is a nuisance which annoys and disturbs one in possession of his property, rendering its ordinary use or occupation physically uncomfortable to him. For such annoyance and discomfort the courts of law will afford redress by giving damages against the wrongdoer, and, when the causes of annoyance and discomfort are continuous, courts of equity will interfere and restrain the nuisance.'' *Bickley v. Morgan Utilities Co., Inc.,* 173 Ark. 1038, 294 S. W. 38.

This court quoted with approval from the case of *Owens v. Phillips,* 73 Ind. 293:

''The right of appellants was not merely to have their house protected from wrongful injury, but they had

the further right to be protected in its comfortable enjoyment. Noises, odors, smoke and dust may possibly work the house itself no material injury, and yet render it impossible for the owner to live in it with comfort. The appellants were not bound to prove both an injury to the property itself and an interference with its enjoyment. * * * It is true, as a general rule, that such acts as result in a mere diminution in value of property, which can be fully and readily compensated in damages, will not supply grounds for an injunction, and parties will be left to the redress afforded by an action for damages. But, while this is true, it by no means follows that interference with the enjoyment of the property will not furnish grounds for relief by injunction, although the property itself may sustain no physical injury whatever. The right to enjoy property is as much a matter of legal concern as the property itself. * * * The owner of property is entitled to enjoy the ordinary comforts of life, and that right is not to be measured by the notions of the people of a particular locality. * * * No man has a right to take from another the enjoyment of what are regarded by the community as the reasonable and essential comforts of life, because the notions of the people of a given locality may not correctly estimate the standard of such comforts." *Durfey* v. *Thalheimer,* 85 Ark. 544, 109 S. W. 519.

The evidence in this case, however, indicates that appellant's junk piles may be so protected that no water can get into the containers and so protected that there may be no danger of breeding mosquitoes. And we think that the junk piles complained of should have a roof over them, and be so protected that there would be no chance for water to accumulate in containers and no chance for the breeding of mosquitoes, and appellant should be required to do this without any unnecessary delay.

Appellant, however, contends that it would cost him $8,000 to move the junk pile to another place. It is not shown what the cost would be to put a roof over it and protect it so that it would not constitute a nuisance. He also says that if he had to sell it at the low market price

he would lose $15,000. But, whatever the cost may be, either to move it or to protect it by a roof, it is the duty of every one to so use his property as not to injure that of another.

This court has said: "It is conceded that the operation of a hide and fur business is not a nuisance *per se,* but the contention is that the operation in the manner in which it is carried on in the locality where the place of business is situated constitutes a nuisance, and we are of the opinion that the preponderance of the evidence sustains this contention. The case affords, perhaps, an example where a business established at a place remote from population is gradually surrounded and becomes a part of a populous center, so that a business which formerly was not an interference with the rights of others has become so by the encroachment of the population. Under these circumstances, private rights must yield to the public good, and a court of equity will afford relief, even where a thing, originally harmless, under certain circumstances has become a nuisance under changed condition." *Ft. Smith* v. *Western Hide & Fur Co.,* 153 Ark. 99, 239 S. W. 724.

Appellant's business has been established for a number of years, and at the time it was established it was probably not an interference with the rights of any one. But it has become so because of the growth of the city, and, having become so, the private rights of appellant must yield to the public good.

We have therefore reached the conclusion that the appellant should be required to protect the property, as above indicated, without unnecessary delay, and that, if he does not do so, he should be required to remove it. The appellant should be permitted to put a roof over his property and protect it in the manner herein indicated within a reasonable time. And, unless it is so protected that it will not be a nuisance, he should be required to remove it. He may be required to remove it at any time if it becomes a nuisance. The junk pile, of course, can be

abated by proper proceedings if at any time hereafter it shall become a nuisance.

The decree of the chancery court is reversed, and the cause is remanded with directions to the court to render a decree in accordance with this opinion.